My name is Robert Williams and I represent the plaintiff appellant Michael Kehoe. This is a case that is similar but different from the prior case. It also involves a pre-existing condition. But in this matter, the theory is that the pre-existing condition was accelerated to the point that, by the work-related incident, that required medical treatment, which should have been found to be compensable, and it was not. Now, our problem, which we address in our briefs, is that the opinion on which the Commission relies in this particular matter is faulty with regard to both the law and the facts. From a factual point of view, Dr. Stokes, on his own motion, so to speak, without any substantial basis in the evidence of record, decided that he was not going to believe the history of the plaintiff. Let's just stop there for a second. As I understand the case, the claimant, several months prior to the accident, saw Dr. Stokes on his own. Stokes told him he needed a hip replacement. Clearly, there was, he needed a hip replacement, apparently, before the incident in question. No question. So how do you discount that part of this? Well, first, Your Honor, Dr. Stokes did indeed tell this individual that he needed a hip replacement, but he didn't schedule it. What he did do is he said, you need to lose a lot of weight, first of all, and then sent them back out onto the street. And let's think about that for a moment. This is a, Dr. Stokes, among other things, is in business. He's going to make a lot more for his bottom line if he performs surgery right now, if that's possible, than not. He does not do that with this man. Now, the incident comes along. The incident, incidentally, in this matter, is falling down a flight of stairs, about four stairs. Mr. Keough is taken away from the job site by This is not the kind of thing that is inconsequential. This is not the kind of thing that is not going to cause a problem to a 50-ish individual who has arthritis all over the place. Well, did the claimant tell the doctors that the armature, that his condition was fine prior to the fall? I don't believe so, Judge. I don't believe he did. Now, Dr. Nelson states that the petitioner told him that he had no pain in the right hip prior to this incident. That's what Nelson says. And Nelson found that to be incredible, didn't he? Exactly right. And I find Nelson to be incredible because that's not in the record. He, Keough has been treated by a bevy of high-powered, board-certified orthopedic surgeons. Dr. Urbanovitz, Dr. Urbanski, pardon me, Dr. Weber, Dr. Curry, who is a pain specialist in that Elmhurst group. He has surgery on his elbow. He's under the care of all these people. He has even referred to Dr. Stokes, as you mentioned, Your Honor, a couple of months before this incident. And take a look. I did once more last night. I can't find anything in any of those treating records that indicate that he has a major problem with pain in the right hip prior to this incident. Well, forgetting about pain for a second, what's troubling me, getting back to a very simple threshold question, is it appears clearly, and the Commission notes this, Stokes notes that the claimant went to see him months before. He told him he needed a hip replacement. The claimant agreed, as you indicated, the only impediment, so to speak, apparently was the weight. He was 100 pounds overweight. All right? I can understand your argument that under the law, that if a preexisting condition makes the claimant more vulnerable or essentially accelerates a preexisting condition, you can argue that he still recovers. He's seeking, in this case, a hip replacement. The doctor he seeks out tells him he needs a hip replacement. At that point, because of the condition of the hip, the claimant agrees. He then slips. What's the recovery based on? He already needs the hip replacement. Oh, yes. That's what I'm struggling with. Excellent question. Believe me when I tell you, when I first took this case in, I thought the same thing. How can you say a cause is generated by an incident when the cause is already there? My answer to that is this. Under our system, and unless we wish to change it, and of course this court is well-situated to do that, but I would pray that you not do so, we don't need the cause for this. The fact that an individual, any of us, at least I'll certainly include myself in this category, being a senior citizen, carry around some preexisting condition or other. So I and many others have a cause for further medical treatment. But if something happens to me that accelerates my need for that treatment, that is a cause. It's quite cerebral, I must admit. At first I wasn't comfortable with this. The more I think about it, Your Honor, the more I think this is the case of the 21st century. Because this is going to be more cerebral by the minute, apparently, but... You know, though, may I respectfully suggest, this is going to be an issue that comes before courts and it's before Congress now and it's going to be everywhere in the 21st century. We have an older population. So why can't I, let's stay right to the issue, because I think I see where you're going. You're saying that the acceleration itself is compensable? Well, it's not that tough in this... Oh, absolutely. Okay, stay with me there. Absolutely. The support for the acceleration can be found in Dr. Stokes' notes and even his recommendation for surgery when he talks exasperation. Yes, sir. Yes, sir. And there's no question that he does that, too. Right, he does. So you're saying that that is... A cause. Is a cause. Yeah, well, and... And, well, I mean, that this incident caused this effect. You know, I think that that's an accurate statement, Your Honor, but I also think this would be an accurate statement as well. It's not quite that cerebral, not quite that metaphysical. If we look at it from this perspective, what Stokes is saying before this incident is that here's a man who needs to be looked at further, tracked, and his only hope for reversing this situation is surgery. Now, this incident comes along, and Stokes says, look, I'll do it right now. Nelson says, oh, no, it's because the preexisting condition progressed to this point. Now, may I respectfully suggest to this Court that this is a matter of first impression when we look at what is required to have a legal basis for Dr. Stokes... Well, you're talking here. I like to deal with it very simply. You're talking about you have Nelson who's talking about a natural progression to the state we find him after the incident. Right. We have Dr. Stokes who says, no, natural state, he might be in this state eight months from now. Exactly. But in my opinion, there's an exasperation, aggravation, or we've used aggravation to resist an injury, so that legal dogma could apply here, but there's an acceleration so that the condition is now, not eight months later, and that... We should pick Stokes over Nelson. The reason is because Nelson doesn't have a legal basis, and we're all lawyers here, for his opinion. Because if he opines, and as we go into the future, and this becomes more and more of an issue with people with preexisting conditions who have something happen and the preexisting condition has advanced, don't we need a timeline to decide when that preexisting condition would have advanced to the point where it becomes pathological and needs the treatment now? That's precisely my question. What exactly was accelerated? He needed a hip replacement, according to Stokes, and acknowledged by his claimant months before this incident. So what exactly was accelerated? Your Honor, this is not like case number one. This is not like Mr. Alexie's case. This is not like we were dealing with the medial meniscus and then the lateral meniscus. This is the same condition. And this is the same condition that is progressing... So, let me answer the question. What was accelerated? The preexisting condition, the... He needed a hip replacement before the fall. He got a hip replacement after the fall. Nelson says the reason he got the hip replacement was because he had a complete joint pace loss and he had degenerative arthritis of the right hip. The answer is in the record, Your Honor. What's the answer? What the condition is called in the record is degenerative hip disease. No, I understand that, but we're back to the question that Judge Hudson asked. What was accelerated? That condition. What do you mean? Who says so? Pardon me? Who says so? Stokes says... Stokes says... He needs it now. He got it after. Well, I don't understand why you're troubled by that. It's not unlike the mayor's wife being put in a wheelchair because she could fracture her leg. Cancer doesn't cause... The question becomes, is there a causal connection between the fall and the need for the surgery, or is the surgery merely the result of a degenerative process? Exactly. And my argument is... The arbitrator said it's the degenerative process based on Nelson's opinion. And I'm saying that not only are there not a sufficient basis in the facts to support Nelson's opinion, I'm saying that there's a legal insufficiency because if we're going to accept Nelson's opinion, we've got to know when precisely did that point occur where the pain becomes intractable. Was it a minute before he fell down the stairs? Was it an hour before he fell down the stairs? That's really important to us because when we cross-examine Dr. Nelson, we want to know, Doctor, what's the basis for your opinion? Why do you think it happened a month before? Because what does he have to rely on it? What did he say when you asked him a question? Pardon me, Your Honor? What did he say? Did you ask him a question? No, we did this on the reports. So why didn't you subpoena him asking a question? It's a legal question, Judge. What I'm saying is that it would be as though a petitioner came up here and said, you know, sometime ago I got hurt. Give me some compensation for that. No, no. Even if it's repetitive trauma, you must specify an identifiable incident. Well, doesn't Wilson v. Clark apply to workers' compensation cases? I'm sorry? Doesn't Wilson v. Clark apply to workers' compensation cases? Absolutely. Well, the expert's entitled to give his opinion. It's your job to find out what the basis is or lack thereof. Yes, yes. And not unlike the prior case, case number one, what I am saying to you is that this Court ought not to adopt the lower opinions, ought not to adopt Dr. Nelson's opinion, because it is insufficient in law and in fact. Well, setting aside Nelson for a moment and looking at the whole, you know, totality of the evidence, what it comes down to, it seems, the Commission determined Klamath needed hip replacement surgery regardless of the fall, and the fall did not aggravate his condition. So why is that against the manifest way to the evidence is the ultimate question here. Why are those findings against the manifest way? Because the opposite conclusion is clearly required when you take the opinion of Dr. Urbanski, the referral to Dr. Urbanski by Dr. Bleier, the opinion of Dr. Curry, the when he says he needs it some months before, but says he ought to lose some weight first. And finally, the testimony of the two lay witnesses who say Keogh was jolly and social and functional and working and all of these kinds of things, and he was not any of those things afterwards. A big change occurred when he fell down the stairs, and the big change was that, as Your point where he needed it now, he needed the surgery now, this is not let's lose some weight, let's pick a different hospital, let's decide where you're going to recuperate. You need it now. That's the difference. Thank you. Thank you. Can I have one more about counsel, please? May I please support counsel? My name is Ruth Masters on behalf of the respondents. The issue before the Court today, as the Court has properly identified, is whether the commission decision that Mr. Keogh's fall did not worsen his hip was against the manifest weight of the evidence. And we submit to the Court that the answer to that question is clearly no. At most, Mr. Keogh has shown some conflicts in the evidence to support his claim, but that is not enough to warrant a decision by this Court that the opposite conclusion of that reached by the commission is clearly required. It's well established that it's up to the commission to decide how much weight to give each piece of evidence, and it's particularly up to the commission to weigh competing medical testimony. Now, I'd like to make a few. I think we understand the law fairly well, but he seems to be hanging his head on what, you know, some could argue would be a slender reed, so to speak. But he's saying, well, he went in, he saw Stokes, he's acknowledging that candidly, and Stokes says, you know, you really need a hip replacement. And he says, but I'd like you to lose 100 pounds. You don't need it today, I suppose. We can defer this while you lose weight. Then he slips. Now, everyone says you've got to have it right now, today. So he's arguing, at least, that puts the case in a different posture. There was acceleration. Obviously, it worsened because of the incident because they now decided it was imminent surgery as opposed to you could take months to lose weight. So how do you respond to his claim that this falls within some aggravation or acceleration doctrine and it's compensable? I have two responses, Your Honor. First of all, that is not an argument that was presented to the commission, so the argument is waived. Secondly, even if it is not waived, it's not supported by the evidence in this record. What happens when Mr. Kehoe goes back to Mr. Stokes, if that – I'm sorry, Dr. Stokes. Sorry, Mr. Kehoe goes back to Dr. Stokes three times after the accident. And as Your Honor recognized beforehand, he already needed the hip replacement surgery. He goes back. The January 27, 2006, report from Dr. Stokes, and that's found at C-308 of the record, is not a recommendation for immediate surgery. He talks to Mr. Kehoe. Mr. Kehoe says, I think I want to have the surgery, but Mr. Kehoe says he wants to delay it for personal reasons. And I'm going to quote now from Dr. Stokes' report. It says, quote, I have told him, meaning Mr. Kehoe, that at his leisure, we would set him up for surgery and make the appropriate care available for him. He goes back again. Mr. Kehoe goes back again to Dr. Stokes on February 13, 2006. And this record is at page 311 of the record. And he says, quote, I will see him back really as the patient sees fit. Let me be clear that Mr. Kehoe, even at the time of this hearing, which was in the summer of 2006, still had not had hip replacement surgery. So there is no record evidence that Dr. Stokes changed his opinion and said, you must immediately, urgently have hip replacement surgery. It's absolutely the case, and certainly the commission was well within its bounds of weighing evidence and making determinations about how much to give each piece of evidence that the commission concluded Mr. Kehoe needed hip replacement before, he needs it after, and that nothing about this accident accelerated, and of course that wasn't the argument made below anyway, but aggravated even, which arguably was an argument made, Mr. Kehoe's hip condition. And there was ample other evidence to support that conclusion. In fact, there was ample evidence that Mr. Kehoe went when he did not tell any of the first responders that he hurt his hip in the fall. The ER records, he didn't tell them that he hurt his fall. He didn't tell any of his treaters until a month later that his hip hurt. So there was no evidence. Well, we have Dr. Stokes when he recommends hip replacement surgery. I cannot find any other specific acute injury except to say that he has exasperated the underlying pathology. Now, that's an opinion about the underlying pathology. It's an opinion about an exasperation, right? It is correct. It is an opinion about exasperation. Well, let's take the concept of that. Is that a compensable concept? I mean, is there a difference between that and the concept of aggravation? It is not compensable in this situation because he already ---- No, I'm hypothetically asking you that. Hypothetically? Sure, there's a lot of case law from this panel that aggravation of a preexisting condition is compensable. Okay, so aspiration would be the same. So we do have Dr. Stokes in this case saying that. Now, why is that not the ---- Because it is doctor ---- It is to be considered by the commission. Well, it is to be considered by the commission. We don't dispute that the commission should consider that and weigh that against all the other evidence and what the commission specifically and we believe appropriately finds. It's not a finding against the manifest rate of the evidence. That when Mr. Kehoe goes and talks to Dr. Kehoe, he is self-reporting what happened. So he goes and he self-reports that this fall made my hip hurt worse. But when we look at, and the commission points this out, when we look at the reports to the first responders, when we look at the ER records, when we look at the records from all of his other treating physicians in the month following, there's no complaint of increased hip pain. So Mr. Kehoe, it's just another credibility factor. Mr. Counsel also points out that he reported to Dr. Urbanowski, who treats him for an elbow injury, finds that his hip was aggravated. Well, the commission properly determined that Mr. Kehoe actually told Dr. Urbanowski that his hip had been entirely asymptomatic prior to the fall. Well, as the panel has recognized, there was plenty of evidence that that absolutely wasn't true. He had already been told he needed a hip replacement surgery and eight months prior to the fall had complained to Dr. Stokes of six months of worsening hip pain. So my point to this Court is that the findings, any finding of the medical treaters that his hip pain is worse is all based upon him saying it's worse. And the actual records from the accident show that that was not the case, or at least it was certainly within the commission's authority, well-grounded within the record to find it was not the case. And again, the question here is, is the commission's finding against the manifest weight of the evidence? We certainly submit that that is not the case. And as for Dr. Nelson's opinion, again, Mr. Kehoe went to Dr. Nelson and said, my hip was totally fine before this accident. And Dr. Nelson, based upon his medical expertise, had ample reason, as Dr. Nelson put it, to discount the veracity of that statement. And again, the commission was well within its authority to give credence to Dr. Nelson's rejection of Mr. Kehoe's self-report that his hip had been fine and he hadn't felt any pain. But the commission also had before it Dr. Stokes' medical records from before the accident. I know the only other point I would make is that we do give the pin site in our record, I mean in our brief, where Mr. Kehoe also began his testimony before the hearing by saying, my hip was fine before the accident and I had no pain before the accident. Again, that statement was contradicted by the medical records from eight months prior. If the Court has no further questions, we'd ask that the decision of the commission be affirmed. It's clearly not against the manifest weight of the evidence. Thank you. Thank you, Counselor Revello. Thank you, Your Honor. May it please the Court, Counsel in her argument made a comment that I thought was so important that I put two X's after it. Did she or did she not argue that in a list of three or four different things that she ticked off, the emergency room report and so on and so forth, there was no hip pain? He didn't complain of any hip pain. So where does Dr. Nelson get off saying that he doesn't believe him about that? The arbitrator spent about three pages talking about the facts, talking about the basis for his decision. Where was he wrong? In that, Your Honor, by choosing Dr. Nelson over the 20-year collective clinical experience that all of these outstanding board-certified treating physicians have in this matter. His decision talks about Dr. Stokes where it is. As well it should. Dr. Stokes' counsel argues that the only thing that makes the petitioner's hip pain worse in this case is the petitioner saying so. I'm not going to, I know you know the record. The record is replete with references to an increasing problem with the right hip. Replete. And major, major points of causal connection are from Dr. Stokes on that regard. Counsel, one minute before I forget, I want to address, and perhaps I should have addressed earlier, on page 15 of your reply brief you cite some cases regarding the burden of proof. However, you provide no pinpoint citations to any of those cases in violation of Supreme Court rules 6 and 341G. So I want to point that out because you need to comply with that, okay? Yes, sir. Yes. Also, too, counsel further argued that there is no need in the evidence that Keogh needed the hip surgery immediately after the fall down the stairs. Again, I would just invite the panel to take a look at the record evidence and see if there isn't a big difference between the four-month prior contact with Dr. Stokes and the one right after this incident. When was right after, by the way? When was right after? It was, I believe, about December the 12th. Yes. Two months after the event? I saw Dr. Urbanski first. Two months after the event? Yes, sir. Yes. And it's the first time that Stokes says as near as he can tell that there's been an acute exacerbation of the underlying pathology. But, Your Honor, keep in mind, up to that point, he's being treated by the company doctor, Dr. Bleier, Mercy Works. And Bleier refers Keogh to Dr. Urbanski, who previously did the left elbow surgery. And one of the basis of the circuit court confirming this is that Urbanski didn't know anything about the hip. That's not right because Urbanski refers him to Stokes, who is the hip man. The evidence is all there. We respectfully submit that upon even a cursory view of the evidence of record, this is a condition that existed before the injury. It's worse after the injury. It requires immediate attention now. And it is all in a line of caution. No, it doesn't say immediate attention. Who said immediate attention? Stokes. No, Stokes just says a hip replacement is appropriate. He doesn't say immediately. The word immediately may not be used, but that is certainly his intent. How do you know this isn't? I'm reading his quote. As near as I can tell, his diagnosis is an acute exacerbation of underlying arthritis. I can't find any other specific acute injury except to say that he has exacerbated the underlying pathology. A hip replacement is appropriate. He apparently has an appointment to see another doctor looking for an etiology of this exacerbation. But, Your Honor, I'm sure you would agree that there was a difference in tone between the four months prior. What you're arguing is he fell, and after he fell, Dr. Stokes said he is appropriate for him to have a hip replacement. Therefore, he needs a hip replacement because he fell. Exactly. I think in logic it's called a post hoc ergo proctor hoc, and it's bad logic. After this, therefore, because of this. I disagree because all we need is a cause. And even if the cause is not a cause. Who says the cause was the fall? Stokes. No, Stokes didn't say that. He apparently has an appointment with another doctor looking for an etiology of this exacerbation. Thank you, counsel. Thank you. The court will take the matter under advisory.